DARDEN, J., and CRONE, J., concur.

**J.M., Appellant–Petitioner,**

v.

**M.A., et al., Appellees–Respondents.**

No. 20A04–0911–CV–640.

Court of Appeals of Indiana.

June 9, 2010.

Rehearing Denied Aug. 16, 2010.

David C. Kolbe, Warsaw, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Elizabeth Rogers, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

In the instant case, we are asked to determine whether a trial court erred by refusing to set aside a default judgment. Although trial courts have broad discretion in applying the Indiana Trial Rules, the rules "shall be construed to secure the just, speedy and inexpensive determination of every action." Ind. Trial Rule 1. While the entry of a default judgment certainly secures a speedy and inexpensive determination, it may neglect to secure a just determination. In the case herein, we con-

clude that the default judgment resulted in an unjust determination.

J.M. (Father) appeals the trial court's denial of his Motion to Set Aside the Determination of Paternity, which was entered as a default judgment and adjudicated him as the legal father of W.H., a minor. Specifically, Father argues that the trial court should have granted his motion because he is not W.H.'s biological father and when he signed the paternity affidavit, he was a minor and thought he was consenting to a guardianship. Additionally, Father contends that the trial court exhibited bias towards him and requests that we remand with instructions to assign a different commissioner.

Concluding that the default judgment should be set aside and that Father has demonstrated that a material mistake of fact existed at the time he executed the paternity affidavit, we reverse the decision of the trial court and remand with instructions that the trial court vacate its order adjudicating Father as the legal father of W.H. and ordering him to pay support. Additionally, because the State has conceded that Father is not W.H.'s biological father, the trial court must set aside the paternity affidavit.

### FACTS [1]

Father and T.H. (Mother) began a relationship sometime in 1998. Mother was four months pregnant at the time and both of them were aware that Father was not the biological father of the child. On January 7, 1999, Mother gave birth to a son, W.H., and Father signed an affidavit of paternity, acknowledging that he is the "natural father" of W.H. Appellant's App. p. 10. At the time Father signed the paternity affidavit, he was six days away from his eighteenth birthday and, according to him, he signed the paternity affidavit because he was told it was necessary to allow W.H.'s grandmother to establish a guardianship over him. Sometime thereafter, M.A. (Grandmother) was granted guardianship over W.H.[2]

On April 7, 2009, the State filed a Petition for Entry of Support and Health Insurance Coverage after Grandmother applied for benefits on behalf of W.H., and a hearing was set for May 22, 2009. On April 14, 2009, Father was served with notice of the petition and the scheduled hearing. On May 21, 2009, Father requested a continuance because he was "out of state on business and cannot make it home on time" and that he was "trying to obtain legal counsel but [was] having financial difficulties." *Id.* at 14.

On May 22, 2009, the trial court denied Father's pro se request for a continuance, stating that Father "had over a month and failed to hire counsel." *Id.* at 12. In addition, the trial court entered a default judgment, adjudicating Father as the father of W.H. and ordering him to pay $47 a week in child support. A compliance and support modification hearing was set for July 10, 2009.

On July 8, 2009, Father, through his attorney, filed a motion to continue the compliance hearing, which was granted and the hearing was rescheduled for September 15, 2009. On August 11, 2009,

---

1. We heard oral argument on April 23, 2010, at Columbia City High School. We would like to thank the school's administration, faculty, and students for their hospitality. In addition, we thank counsel for their able presentations.

2. Although the record is not entirely clear, it appears that Grandmother is W.H.'s maternal grandmother. Mother is disabled and Grandmother has guardianship over her as well as W.H. The record is not clear as to whether Mother was disabled at the time of W.H.'s birth.

Father filed a Motion to Set Aside Determination of Paternity, alleging that he is not W.H.'s biological father, he was a minor when he signed the paternity affidavit, he signed the affidavit without the benefit of counsel, and he thought he was consenting to a guardianship when he signed the affidavit. A hearing on this motion was set for September 15, 2009, at the same time as the compliance hearing.

At the September 15, 2009, hearing, Father established that at the time he signed the paternity affidavit, he was six days away from his eighteenth birthday. Additionally, Mother testified that Father was not W.H.'s biological father and that Father was aware of this at the time he signed the paternity affidavit. Mother indicated that she was not sure why Father signed the paternity affidavit.

During the compliance portion of the hearing, the State established that Father's child support was $663.48 in arrears but that Father had been in compliance with the child support order since July 8, 2009. The State requested that "a small amount be paid to liquidate that arrears, but other than that [it was] satisfied with [Father's] performance." Tr. p. 8.

The trial court noted that Father had not taken any steps to disestablish paternity until the State had filed its petition on April 7, 2009. Additionally, the trial court observed that although Father had received notice of the May 22, 2009, hearing, he failed to appear and that his request for a continuance had been denied. The trial court concluded that "Father's lack of appearance at that hearing ratified the previously signed affidavit of paternity" and that Father had "effectively signed and is going to be held to the legally binding affidavit, which constitutes a 'poor man's adoption' of [W.H.]." *Id.* at 7. Finally, the trial court ordered that Father continue to pay "forty-seven dollars ($47.00), plus ten

dollars ($10.00) per week to arrears." *Id.* at 10. Father now appeals.

## DISCUSSION AND DECISION

### I. Procedural Posture

■ As an initial matter, the State points out in a footnote that "a trial court may not disestablish paternity in the course of a child support proceeding," and that, consequently, Father could not have been granted the relief he sought through his motion to set aside the determination of paternity. Appellee's Br. p. 5 n.3. The State argues that "it is not entirely clear whether an appeal of the trial court's denial of his motion to set aside determination of paternity (which was not properly filed in the trial court) is properly before this Court." *Id.*

In support of its argument, the State directs us to *In re Paternity of M.M.*, where a different panel of this court stated that the "Indiana Code does not provide for the filing of a direct action to disestablish paternity, and a trial court may not disestablish paternity in the course of child support proceedings." 889 N.E.2d 846, 848 (Ind.Ct.App.2008), *reh'g denied.* The *M.M.* court, however, went on to state that, "[n]evertheless, the Indiana Legislature has provided for the rescission of paternity affidavits in rare circumstances and the granting of such relief essentially disestablishes paternity," and addressed the merits of the putative father's motion to set aside the paternity affidavit. *Id.* at 848–49. Likewise, this panel will address the merits of Father's motion to set aside the determination of paternity.

### II. Motion to Set Aside Paternity Determination

#### A. Excusable Neglect

■ Proceeding to the merits, Father argues that the trial court abused its dis-

cretion when it denied his motion to set aside the determination of paternity. Because the trial court entered a default judgment adjudicating Father as the legal father of W.H., Father characterizes his motion to set aside the determination of paternity as a motion for relief from judgment under Indiana Trial Rule 60(B) (Rule 60(B)), and we agree with this characterization.

This court reviews the denial of a Rule 60(B) motion for an abuse of discretion. *G.B. v. State*, 715 N.E.2d 951, 952 (Ind.Ct. App.1999). We will not find an abuse of discretion unless the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.* at 953. "On a motion for relief from judgment, the burden is on the movant to demonstrate that relief is both necessary and just." *Id.*

■ Although Father did not specify the provision of Rule 60(B) on which he based his motion, he argues on appeal that his failure to appear at the May 22 hearing was attributed to excusable neglect. Accordingly, it appears that Father's argument is based on Rule 60(B)(1), which provides in relevant part that "[o]n motion and upon such terms as are just the court may relieve a party or his legal representative from a judgment, including a judgment by default, for the following reasons . . . mistake, surprise, or excusable neglect." When ruling upon a Rule 60(B) motion, "[t]he trial court must balance the need for an efficient judicial system with the judicial preference for deciding disputes on the merits." *Munster Cmty. Hosp. v. Bernacke*, 874 N.E.2d 611, 613 (Ind.Ct.App.2007).

In the instant case, the day before the May 22 hearing, Father requested a continuance because he was out of the state on a work assignment and needed more time to hire an attorney because he was

experiencing "financial difficulties." Appellant's App. p. 14. Under these facts and circumstances and in light of the extensive consequences of the trial court's default order, we find that Father has established that his failure to attend the May 22 hearing was the consequence of excusable neglect and that relief from judgment is both necessary and just.

### B. Meritorious Claim or Defense

■ Our inquiry, however, does not end there. Rule 60(B) requires that a movant filing a motion under Rule 60(B)(1) "allege a meritorious claim or defense." Father maintains that he raised a meritorious claim when he requested that the trial court set aside the paternity determination because he was a minor when he signed the paternity affidavit, he signed the affidavit without the benefit of counsel, he thought that he was signing the affidavit so that W.H.'s grandmother could establish a guardianship over the child, and, perhaps most compelling, he is not W.H.'s biological father.

Indiana Code article 14 provides for the establishment of paternity of a child born out of wedlock. Indiana Code section 31–14–2–1 states that "[a] man's paternity may only be established . . . in an action under [article 14]; or [ ] by executing a paternity affidavit in accordance with IC 16–37–2–2.1 [ (the Statute) ]." Additionally, a man is a child's legal father if he executed a paternity affidavit pursuant to the Statute and the paternity affidavit has not been rescinded or set aside under the Statute. I.C. § 31–14–7–3.

Subsection (h) of the Statute provides that "a man who is a party to a paternity affidavit executed under this section may, within sixty (60) days of the date that a paternity affidavit is executed under this section, file an action in a court with jurisdiction over paternity to request an order

for a genetic test." However, after sixty days have passed, a paternity affidavit may not be rescinded unless a court:

(1) has determined that fraud, duress, or material mistake of fact existed in the execution of the paternity affidavit; and

(2) at the request of a man described in subsection (h), has ordered a genetic test, and the test indicates that the man is excluded as the father of the child.

Ind.Code § 16–37–2–2.1(i). Here, there is no question that more than sixty days have passed since the paternity affidavit was signed in 1999. Consequently, subsection (i) is applicable to the case herein.

In support of Father's position that the paternity affidavit should be set aside, he directs us to *M.M.*, in which the purported father executed a paternity affidavit, allegedly without an explanation of the affidavit's legal consequences. 889 N.E.2d at 847. Approximately seventeen months later, the purported father and the child took part in genetic testing that excluded him as the child's biological father. *Id.*

The purported father filed a petition for modification of child support and approximately four months later, he filed a motion to set aside the paternity affidavit and requested DNA testing, alleging that the paternity affidavit was the product of fraud or material mistake of fact. *Id.* At a hearing on the motion, the purported father testified that the mother had told him that he was the only one who could be the child's biological father. *Id.* Nevertheless,

the trial court denied the motion to set aside the paternity affidavit, reasoning that there had been " 'acquiescence when the order of support was entered' and 'case law favors establishment being supported [sic] over disestablished.' " *Id.* (quoting tr. p. 4).

On appeal, a panel of this court acknowledged that there is an important public policy in favor of establishing the paternity of a child born out of wedlock, but pointed out that " 'public policy disfavors a support order against a man who is not the child's father.' " *Id.* at 848 (quoting *In re Paternity of S.R.I.*, 602 N.E.2d 1014, 1016 (Ind. 1992)). Additionally, this court observed that the purported father had testified without contradiction that the mother had told him that he was the only potential father of the child and, consequently, that the purported father had established either fraud or a material mistake of fact. *Id.* This court ultimately reversed the trial court and remanded with instructions to the trial court to order a genetic test in accordance with the second prong of subsection (i) of the Statute. *Id.* at 849.

In the instant case, it is undisputed that Father was a minor when he signed the paternity affidavit and that he signed the affidavit without the benefit of counsel.[3] Additionally, Father maintains that he believed that he was signing the paternity affidavit to grant guardianship of W.H. to the child's grandmother. Indeed, Grandmother was granted guardianship over W.H., thus his explanation is consistent

---

**3.** Although not necessarily relevant to the present proceedings, it is telling that the 2010 General Assembly amended Indiana Code § 16–37–2–2.1 such that subsection (r) provides that a

 person identified as the father under subsection (e)(1) [who is] less than eighteen (18) years of age; must have an opportunity to consult with any adult chosen by the

individual regarding the contents of a paternity affidavit before signing the paternity affidavit under this section. A signed paternity affidavit is *voidable* if the individual does not have the opportunity to consult with an adult chosen by the individual.

The amended version of the Statute will take effect on July 1, 2010. P.L. 25–2010 (emphasis added).

with the course of events. Perhaps most compelling, Mother testified at the September 15, 2009, hearing that Father "is not the [biological] father" of W.H. and that she was "four (4) months pregnant" when they "hooked up." Tr. p. 6.

Notwithstanding this evidence, in the trial court's September 15, 2009, order, it observed that although it is the "Court's practice, when timely filed or requested, to order DNA testing for individuals who sign affidavits of paternity prior to their eighteenth (18th) birthday unless some type o[f] ratification of that order occurs," it concluded that "Father's failure to appear at said hearing ratified the previously signed affidavit of paternity." Appellant's App. p. 8. Moreover, the trial court acknowledged that Father "knew at the time of birth that he was not the biological father of [W.H.]," but concluded that "[Father] effectively signed and is going to be held to the legally binding affidavit, which constitutes a *poor man's adoption* of [W.H.]." *Id.* (emphasis added).

In light of our conclusion that Father's failure to attend the May 22 hearing was the consequence of excusable neglect, we cannot agree with trial court's conclusion that Father "ratified" the previously signed paternity affidavit. Moreover, similar to this court's decision in *M.M.*, we conclude that the totality of the circumstances herein indicates that a material mistake of fact existed at the time Father executed the paternity affidavit.

Nevertheless, as stated above, subsection (i) of the Statute also provides that before a paternity affidavit can be rescinded, the purported father must request that the court order genetic testing and that the results of the testing must exclude him as the child's biological father. Likewise, subsection (k) states that a "court may not set aside the paternity affidavit unless a genetic test ordered under subsection (h)

or (i) excludes the person who executed the paternity affidavit as the child's biological father."

As stated above, Mother testified that Father is not W.H.'s biological father. Additionally, the State conceded at oral argument that Father is not W.H.'s biological father. Consequently, although in most cases the Statute would require this court to remand the case to the trial court for genetic testing, it is unnecessary that we do so here.

As for the trial court's conclusion that by signing the paternity affidavit, Father had effectively executed a "poor man's adoption," appellant's app. p. 8, we emphasize that the General Assembly has set forth specific provisions governing adoption in the Indiana Code. Additionally, it is well established that the adoption statutes are in derogation of the common law and, therefore, must be strictly construed. *In the Matter of Paternity of Baby Girl*, 661 N.E.2d 873, 876 (Ind.Ct. App.1996); *Mullis v. Kinder*, 568 N.E.2d 1087, 1089 (Ind.Ct.App.1991). Accordingly, a man cannot adopt a child simply by executing a paternity affidavit because it circumvents the legislative process. Perhaps even more problematic, permitting a man to effectively adopt a child in this manner would allow him to displace the biological father. Consequently, the trial court erred by concluding that Father had effectively executed a "poor-man's adoption" when he signed the paternity affidavit.

That being said, we note that in Indiana, "there is a substantial public policy in correctly identifying parents and their offspring. Proper identification of parents and child should prove to be in the *best interests of the child* for medical or psychological reasons." *In re Paternity of S.R.I.*, 602 N.E.2d at 1016 (emphasis add-

ed). And when the State files a paternity action for child support, as it did in this case, it represents the child. I.C. § 31–14–4–2. Accordingly, if the State determines that a putative father is not the child's biological father, the State has an obligation not to pursue a paternity action against the putative father. This obligation is consistent with the best interests of the child and it protects the biological father and a putative father who is not the child's biological father. Moreover, we applaud the trial court's practice of ordering genetic testing whenever a putative father signs a paternity affidavit before his eighteenth birthday, and we encourage the use of genetic testing in paternity actions.

In sum, we conclude that a material mistake of fact existed at the time Father executed the paternity affidavit. Additionally, because Mother testified that Father is not W.H.'s biological father and the State conceded that Father is not W.H.'s biological father, we do not need to remand for genetic testing. Therefore, we reverse the decision of the trial court and remand with instructions to the trial court to vacate its order adjudicating Father as the legal father of W.H. and ordering him to pay support and to set aside the paternity affidavit.

### III. Judicial Bias

 Father contends that "Commissioner Biddlecome exhibited bias toward the litigants ... as is evident from her demeanor and attitude demonstrated at the [September 15, 2009] hearing" and requests that this court remand the case back to the trial court "for assignment to a new commissioner." Appellant's Br. p. 12–14. The law presumes that a judge is unbiased and unprejudiced. *James v. State,* 716 N.E.2d 935, 940 (Ind.1999). When a judge's impartiality might reasonably be questioned because of personal

bias against a party, a judge shall disqualify herself from a proceeding. *Id.*

 The test for determining whether a judge should recuse herself is "whether an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's impartiality." *Id.* Furthermore, the party alleging judicial bias "must show that the trial judge's action and demeanor crossed the barrier of impartiality and prejudiced the [party's] case." *Flowers v. State,* 738 N.E.2d 1051, 1061 (Ind.2000). An adverse ruling alone is insufficient to show bias or prejudice, *Id.* at 1060 n. 4.

Father claims that the trial court exhibited bias in the following ways:

1. Attempting to solicit an objection to an exhibit after the attorney representing the State of Indiana had stipulated to its admission;

2. Exhibiting condescension toward witnesses and counsel for [Father] during the hearing itself;

3. Concluding the denial of [Father's] motion before he was finished presenting evidence;

4. Questioning [Father's] counsel on what the point was in calling a witness who would verify that [Father] was not the father of the child and then stating, before the natural mother was to testify that the Appellant was not the father, that "it doesn't matter."

Appellant's Br. p. 12.

Regarding the first alleged instance of judicial bias, Father points out that at the September 15, 2009, hearing when Father's counsel attempted to introduce a photocopy of Father's driver's license, without objection from the State, the trial court stated the following:

> People lie on ... on their licenses, I don't know. It's not a certified mail, uh

... it's not a certified business record, and if anyone objected, then I would sustain the objection. Does anybody object to a copy of his driver's license being admitted to prove his date of birth?

* * *

The State: The State's position is that Father's age is relatively immaterial, Your Honor.

The Court: It certainly is. What does that mean? Are you objecting or are you not objecting?

Tr. p. 4 (ellipses in original). As to the second alleged instance of judicial bias, Father directs us to the following colloquy between the trial court, Father's counsel, and Mother:

> The Court: Well ... would you agree that he was under eighteen when he signed that affidavit?
>
> [Mother]: (inaudible).
>
> The Court: Did you know how old he was when ya had the kid?
>
> [Mother]: Yes. Yes, I did. I'd agree.
>
> The Court: Okay. It's a fairly simple question. How old were you?
>
> * * *
>
> The Court: He know [sic] you were pregnant before you two hooked up?
>
> [Mother]: Yes ... (inaudible).
>
> The Court: Pardon?
>
> [Mother]: I was four (4) months pregnant.
>
> The Court: That'd be a good clue ... and why did he sign the affidavit knowing it wasn't his?
>
> [Mother]: I'm not sure why. When I was delivering him, I was pretty out of it.
>
> Mr. Kolbe: He thought he was consenting to a guardianship. We placed that in our petition, Judge.

The Court: Kinda plain language, isn't it?

Mr. Kolbe: He was a minor and he is not a highly educated person.

The Court: Guess he should've showed up at the hearing that it [sic] was set.

Mr. Kolbe: Would you like to explain to the Judge why you didn't—

The Court: I know why he didn't show up. He didn't make any other arrangements.

Id. at 5–6 (ellipses in original). The third instance of alleged judicial bias occurred before Father was finished presenting evidence when the trial court made the following unsolicited statement:

> Yep, you were served and you didn't come. The guardian came, the mother came and you didn't. You wanted a continuance to hire counsel and you'd had a month before that to do that—and you didn't. So ... your petition is denied.

Id. at 5 (ellipsis in original). Finally, the fourth alleged instance of judicial bias occurred immediately after the trial court made the above statement as Father's counsel tried to call Mother as a witness:

> Mr. Kolbe: Your Honor, for purposes of the record, I did have another witness to call. May I do so? Understanding that you'll still deny it.
>
> The Court: What's the purpose of the other witness?
>
> Mr. Kolbe: For the purposes of establishing—placing in the record—what the witness' testimony would be.
>
> The Court: Is this the girlfriend?
>
> Mr. Kolbe: This is the mother.
>
> The Court: It doesn't matter.

Id. at 5.

Additionally, Father contends that the commissioner's post-hearing activity is of even greater concern. Father points out

that although the commissioner dictated the outcome of the proceedings from the bench at the September 15, 2009, hearing, it was not until October 16, 2009, that she reduced the order to writing, signed it, and made an entry reflecting the order in the Chronological Case Summary (CCS). Nevertheless, the commissioner intentionally backdated the order and CCS entry to September 15, 2009. Father's counsel had to specifically request the presiding judge of the trial court to correct the CCS so as to reflect what actually had occurred. Father contends that this activity "carries with it the inference of some bias or potential harm to him which justifies this Court setting aside any determinations made by Commissioner Biddlecome and directing this back to the trial court for further action." Appellant's Br. p. 13.

 The State counters that Father has waived review of any alleged judicial bias, inasmuch as he failed to object to the trial court's comments during the hearing. Our Supreme Court has stated that "[w]here a defendant fails to object or otherwise challenge a trial judge's remarks, any alleged error is waived on appeal." *Garrett v. State*, 737 N.E.2d 388, 391 (Ind.2000). Nevertheless, a party can still prevail on appeal if he can establish that the trial court's bias or prejudice rose to the level of fundamental error. *Hollinsworth v. State*, 920 N.E.2d 679, 683 (Ind.Ct.App.2009). The fundamental error doctrine has been described as "extremely narrow," and to qualify as fundamental error " 'an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible.' " *Id.* at 684 (quoting *Mitchell v. State*, 726 N.E.2d 1228, 1236 (Ind.2000), *overruled on other grounds by Robinson v. State*, 805 N.E.2d 783, 787 (Ind.2004)).

In the instant case, the State correctly observes that Father did not object to the trial court's comments and that he does not argue on appeal that the trial court's bias rose to the level of fundamental error. Consequently, this argument fails.

That being said, we do not intend for this result to be interpreted as this court's approval of the trial court's dismissive and condescending rhetoric during the September 15, 2009, hearing. To be sure, we find such behavior among Indiana's judiciary to be undesirable and discourage such behavior in future cases. Indeed, if further proceedings were necessary in the instant case, we would order that the trial judge, rather than the commissioner, be assigned to those proceedings.

The decision of the trial court is reversed and remanded with instructions that the trial court vacate its order adjudicating Father as the legal father of W.H. and ordering him to pay child support. Additionally, because the State has conceded that Father is not W.H.'s biological father, the trial court must set aside the paternity affidavit.

CRONE, J., and BRADFORD, J., concur.